James W. **WETZLER**, as Commissioner of Taxation and Finance of the State of New York, and the New York State Department of Taxation and Finance, Plaintiffs,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver of the Seamen's Bank for Savings, F.S.B.,** Defendant.

No. 92 Civ. 4343 (LMM).

United States District Court, S.D. New York.

Feb. 25, 1993.

Robert Abrams, Atty. Gen. for state of NY, and Frederic L. Lieberman, Asst. Atty. Gen., New York City, for plaintiffs, James W. Wetzler, New York State Dept. of Taxation and Finance.

Steven A. Hammond and Kevin M. Crotty of Hughes Hubbard & Reed, New York City, for defendant F.D.I.C.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

By this Order, the Court decides cross motions by defendant Federal Deposit Insurance Corporation (the "FDIC") and by plaintiffs James W. Wetzler and the New York State Department of Taxation and Finance ("Plaintiffs") for summary judgment pursuant to Rule 56(b) and (c) of the Federal Rules of Civil Procedure. The FDIC is the Receiver of the Seamen's Bank for Savings, F.S.B. ("Seamen's"). At issue in this case is the proper construction of section 1823(i)(9) of the Garn–St. Germain Depository Institutions Act, 12 U.S.C. § 1823(i)(9) (Supp. II 1990) (the "Garn Act"), and the effect of the Garn Act on the administration of the State of New York's Bank Franchise Tax, N.Y. Tax Law §§ 1450 *et seq.* (McKinney 1975) (the "New York Franchise Tax"), for the years 1982, 1983, and 1984.[1] For the reasons that appear below, the FDIC's motion is granted and Plaintiffs' motion is denied.

### Background

In the fall of 1982, Congress passed the Garn Act[2] in order to assist financially troubled banking institutions whose deposits were insured by the FDIC. "Congress determined that one method of accomplishing this goal was to permit the FDIC to issue promissory notes to ailing banks in exchange for the banks' 'net worth certificates.' " *FDIC v. New York,* 928 F.2d 56, 57 (2d Cir.1991). Net worth certificates were to correspond with the promissory notes in value and interest rate.[3] While it may be argued that "[n]et worth assistance under the Garn Act is thus merely a paper transaction (an exchange of notes for net worth certificates) to bolster the net worth of weak banks" (Pls.' Mem. at 4), "Congress believed that the exchange would 'partially offset [participating banks'] current losses and shore up the net worth of qualified institutions.' " *FDIC v. New York,* 928 F.2d at 57 (quoting S.Rep. No. 536, 97th Cong., 2d Sess. 10 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3054, 3063). "In other words, by issuing promissory notes to the banks, the FDIC would, in effect, be guaranteeing some of the banks' assets." *FDIC v. New York,* 928 F.2d at 57. In this way, "Congress sought to strengthen the capital base of ailing thrift institutions with minimal use of federal revenues." (FDIC's Mem. at 8.)

In order to be a qualified institution within the meaning of the Garn Act, a depository institution must, *inter alia,* (i) maintain insured deposits, (ii) have a net worth equal to or less than three percent of its assets, (iii) have incurred losses during the two previous quarters, (iv) agree to comply with all terms and conditions established by the FDIC, and (v) not have a net worth of less than one-half of one percent of assets after any purchase of its net worth certificates by the FDIC. 12 U.S.C. § 1823(i)(2) (Supp. II 1990). It is undisputed that "Seamen's was a qualified institution within the meaning of the Garn Act, 12 U.S.C. § 1823(i)(2), during a portion

---

**1.** The Court considers only the New York law in effect for those years.

**2.** Pub.L. No. 97–320, 96 Stat. 1469 (codified as amended at 12 U.S.C. §§ 1811 *et seq.* (1988 & Supp. II 1990)).

**3.** "Dividends on any certificate so purchased shall be at a rate equivalent to the rate of interest paid on any promissory note used to purchase the certificate." 12 U.S.C. § 1823(i)(1)(B) (Supp. II 1990).

of the fourth quarter of 1982, in the first, second and third quarters of 1983, and in the second quarter of 1984." (Pls.' Mem. at 4; *see also* Hammond Aff. Ex. A ¶¶ 7–8, 30–31, & 41–42.)[4]

Section 1823(i)(9), the meaning of which is vigorously contested by the parties, provides that:

> During any period when a qualified depository institution has outstanding net worth certificates issued in accordance with this subsection, such depository institution shall not be liable for any State or local tax which is determined on the basis of the deposits held by such depository institution or the interest or dividends paid on such deposits.

12 U.S.C. § 1823(i)(9) (Supp. II 1990). The State of New York imposes a tax based on deposits held or interest or dividends paid by depository institutions. (Pls.' Mem. at 5.) "New York's alternative minimum Bank Franchise Tax, New York Tax Law § 1455(b)(2) and (3), measured by deposits held and interest or dividends credited to depositors or shareholders, was such a tax." (Pls.' Mem. at 5.) At issue, then, is whether the State of New York may collect taxes assessed on the basis of Seamen's deposits for the taxable years 1982, 1983, and 1984 during which Seamen's had net worth certificates outstanding. The Court concludes that the State of New York may not.

*Discussion*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only where "there is no genuine issue as to any material fact" and a party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In the present case, the material facts are not in dispute, and the parties' motions can be determined as a matter of law.

■ In enacting the Garn Act, Congress weighed different methods of granting relief from state and local deposit taxes to depository institutions receiving the Garn Act's benefits. Congress considered, but rejected, a proposal to grant such institutions deferral from the payment of deposit taxes. *See* 128 Cong.Rec. 10811 (1982). Instead, Congress enacted section 1823(i)(9) which confers exemption from state and local deposit taxes "[d]uring any period when a qualified depository institution has outstanding net worth certificates."[5] Congress failed, however, to provide any specific direction with respect to the meaning of the term "period." Plaintiffs contend that "period" refers only to those particular days on which a depository institution was qualified to enter into an exchange of net worth certificates for promissory notes and had net worth certificates outstanding. (Pls.' Mem. at 14.) The FDIC, on the other hand, argues that "period" means the interval for which the deposit tax due is assessed, in this case the calendar year. In this Court's view, the FDIC's interpretation is consonant with the overall statutory purpose of the Garn Act and effects a result compatible with its legislative history.

■ Plaintiffs rightly observe that "where ... the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) (citations omitted); *see also United States v. Goldberger & Dubin, P.C.*, 935 F.2d 501, 506 (2d Cir.1991) ("words of a statute should be given their normal meaning and effect in the absence of a showing that some other meaning was intended"). "[T]he purpose of a statute includes not only what it sets out to change, but also what it resolves to leave alone.... The best evidence of that purpose is the statutory text adopted by both

---

4. Seamen's incurred losses in the second and third quarters of 1982. (Hammond Aff. Ex. A ¶¶ 7–8.) "Seamen's incurred losses in the first, second and fourth quarters of 1983." (FDIC's Mem. at 13 n. 13.) "Seamen's incurred losses in the first and third quarters of 1984." (*Id.* at 14 n. 17.)

5. Congress adopted a Senate proposal for a portion of the legislation that later became the Garn Act. That version included provision for the issuance of net worth certificates. "The Senate concept establishing an income capital assistance program was adopted rather than the guarantee concept in the House bill." S.Conf.Rep. No. 641, 97th Cong., 2d Sess. 86 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3128, 3129.

Houses of Congress and submitted to the President." *West Virginia University Hospitals, Inc. v. Casey,* 499 U.S. 83, ——, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991). But when the statute's language is not clear, courts must attempt to interpret a statute in such a manner as will effectuate Congress' overriding remedial purpose. "'Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.'" *Toibb v. Radloff,* —— U.S. ——, ——, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991) (quoting *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984)). "[C]ourts 'appropriately may refer to a statute's legislative history to resolve statutory ambiguity.'" *Patterson v. Shumate,* —— U.S. ——, ——, 112 S.Ct. 2242, 2248, 119 L.Ed.2d 519 (1992) (citation omitted).

The parties have demonstrated that the use of "period" in section 1823(i)(9) is susceptible of differing interpretations—including a taxable year, a quarter, a month, or even a few days—without doing violence to the language of the statute. Dictionary definitions are not, in the case of the word "period" as used in the statute, of much use. According to Webster's Third New International Dictionary, for instance, the definition of the phrase "period" includes "a point of time marking a termination of a course or an action ... a temporal unit of measure ... the completion of a cycle, a series of events, or a single action ... a portion of time determined by some recurring phenomenon." Webster's Third New International Dictionary 1680 (1986).

The legislative history of the Garn Act clarifies Congress' purpose in enacting this legislation. Congress sought to maintain solvency at the nation's FDIC insured savings institutions, an object which in Congress' view was "necessary for the survival of both the industry and the insurance system." 128 Cong.Rec. 10803 (1982). While deliberating a prior draft of the legislation that later became the Garn Act, Representative John J. LaFalce discussed state and local franchise taxes.

> Such taxes are not based on profits, and thus failing institutions are equally liable, yet the committee was reluctant to permit Federal assistance payments to flow through the institutions into State coffers. The original version of the bill simply exempted institutions from such State taxes. Although I am opposed on principal to franchise taxes, I am equally opposed to Federal overrides of State taxing prerogatives, and thus I was pleased to support a compromise amendment which simply provides for a delay in payment of State franchise taxes during participation in this program.

*Id.* On May 4, 1982, Representative Fernand J. St Germain, one of the Garn Act's sponsors, stated in his summary of the revised bill that "an institution which has outstanding guarantees may not pay any state or local tax that is based on deposits rather than on the profit or loss of the institution." 128 Cong.Rec. 8656 (1982). In an explanation of the Garn Act, it is stated that the state law overrides provision provides that "[a]s long as a qualified institution has notes outstanding, it will not be liable for any State or local franchise tax." S.Rep. No. 536, 97th Cong., 2d Sess. 52 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3054, 3106.

In reaching the conclusion that section 1823(i)(9) exempts a depository institution from payment of any state franchise tax for the entire taxable year in which such an institution has outstanding net worth certificates, the Court does not rely on statements made after enactment of the Garn Act by Senators Garn and Proxmire.[6] The Court also finds that the FDIC's analogy to the Federal Home Loan Bank Board's interpretation of a nearly identical net worth certificate statute is irrelevant to determination of the present case. Additionally, Plaintiffs appear to contend that the FDIC's responses to inquiries made by them shortly after enactment of the Garn Act preclude the FDIC

---

6. "Congress intended that for so long as an institution has net worth certificates outstanding, such institution would not be liable for a tax based on deposits held or on interest or dividends paid on deposits." (Hammond Aff. Ex. B at 1.)

from asserting its present posture. The Court does not agree. The FDIC's initial decision to decline to adopt an official position with regard to the tax relief provisions of section 1823(i)(9) may not be construed as acquiescence in Plaintiffs' interpretation of the Garn Act. The FDIC was not a party to any tax dispute between the State of New York and a FDIC insured institution at the time Plaintiffs sought counsel from the FDIC.

In addition to the language of section 1823(i)(9) and its legislative history, the correlation between the Garn Act and the New York Franchise Tax aids the Court in its analysis of the period for which deposit taxes may not be levied against Seamen's under the Garn Act. The New York Franchise Tax is an annual tax. "For the privilege of exercising its franchise or doing business in this state in a corporate or organized capacity, a tax ... is hereby annually imposed on every banking corporation for each of its taxable years, or any part thereof." N.Y. Tax Law § 1451(a) (McKinney 1975). "It must be remembered that the franchise tax is not an income tax. The franchise tax is a tax imposed for the privilege of doing business in the State as a corporate entity." *Savings Bank of Utica v. New York State Tax Commission,* 107 A.D.2d 205, 485 N.Y.S.2d 903, 906 (N.Y.App.Div. 4th Dep't), *aff'd,* 66 N.Y.2d 769, 497 N.Y.S.2d 368, 488 N.E.2d 114 (N.Y. 1985). "The phrase 'taxable year' means the taxpayer's taxable year for federal income tax purposes, or the part thereof during which the taxpayer is subject to the tax imposed by this article." N.Y. Tax Law § 1450(b) (McKinney 1975). The United States Corporation Income Tax Return forms 1120 indicate that Seamen's taxable year for federal income tax purposes is the calendar year. (*See, e.g.,* Place Aff. Exs. D, G, & L.) In addition, the taxable periods indicated on Seamen's New York State Franchise Tax Return for Banking Corporations forms CT–32 are the calendar years 1982, 1983, and 1984. (*Id.* Exs. D, G, & L.) Plaintiffs do not contest that Seamen's taxable periods for the contested years at issue in this action ended on December 31, 1982, December 31, 1983, and December 31, 1984. (Pls.' Mem. at 8–10; Place Aff. ¶¶ 12, 14, & 18.) The phrase "or any part thereof" contained in section 1451(a), therefore, has no relevance to the instant action because Seamen's taxable period is the calendar year, not a portion of a year.

The New York Franchise Tax is "measured by the largest of either the bank's entire net income, an alternative minimum tax, or a flat tax of $250." (Pls.' Mem. at 2–3.) "The calculation of the corporate franchise tax is based upon a corporation's entire net income, which is defined as the 'total net income from all sources which shall be the same as the entire taxable income which the taxpayer is required to report to the United States treasury department.'" *Anchor Savings Bank, F.S.B. v. Chu,* 117 A.D.2d 889, 498 N.Y.S.2d 898, 900 (N.Y.App.Div. 3d Dep't 1986). "The two different means of computing the alternative minimum tax for savings banks and savings and loan associations both depended on the amount of interest or dividends credited to the bank's depositors within a period." (Pls.' Mem. at 3.) That period is the taxable year, which under the circumstances of the case is the calendar year. N.Y. Tax Law § 1455(b)(2) (McKinney 1975). In addition, the New York Franchise Tax cannot be computed until the close of the taxable year because only at the end of the year is it possible to determine liability for the basic tax, the alternative minimum tax, or the flat tax. Seamen's exemption period under section 1823(i)(9) must be applied to the taxable years 1982, 1983, and 1984 because Congress intended to exempt ailing banking institutions from state and local deposit taxes, the New York Franchise Tax is an annual tax, and Seamen's had outstanding net worth certificates for a portion of each of those years. Accordingly, Seamen's is entitled to an exemption from New York Franchise Tax for the years 1982, 1983, and 1984.

*Summary*

For all the foregoing reasons, the FDIC's motion, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, is granted and Plaintiffs' motion, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, is denied.

Counsel will appear for a conference on March 31, 1993 at 4:30 P.M. to discuss the scheduling of discovery on the issue of the FDIC's counterclaim.

SO ORDERED.